A.R. John Hitchings, Esq.
Amit Shertzer, Esq.
SICHENZIA ROSS FERENCE CARMEL LLP
1185 Avenue of the Americas, 31st Floor
New York, New York 10036
Telephone: (212) 930-9700
Facsimile: (212) 930-9725
E-mail: jhitchings@srfc.law
        ashertzer@srfc.law

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JOHN HANCOCK LIFE & HEALTH INSURANCE COMPANY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| v. | : | CASE NO.: |
| | : | |
| SAURIN P. MEHTA and PRITI S. MEHTA, | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFF'S COMPLAINT WITH JURY DEMAND**

Plaintiff John Hancock Life & Health Insurance Company ("John Hancock" or "Plaintiff"), by and through its counsel, Sichenzia Ross Ference Carmel LLP, alleges for its Complaint against Defendants Saurin P. Mehta ("Mr. Mehta") and Priti S. Mehta ("Mrs. Mehta" and, with Mr. Mehta, "Defendants"), as follows:

INTRODUCTION

1. This lawsuit arises from Mr. Mehta's deliberate actions to defraud John Hancock by submitting false and misleading invoices to improperly obtain long-term care insurance reimbursement payments under Mr. Mehta's Long-Term Care Insurance Policy (the "LTC Policy"). As described more fully in this Complaint, John Hancock seeks the return of those ill-

1

gotten payments, which total at least $180,065.

2. Despite being caught "red-handed," Mr. Mehta has refused to return to John Hancock the ill-gotten fruits of his deceptive, manipulative, and exploitative practices.

3. Mr. Mehta was aided and abetted by his wife, Mrs. Mehta, in perpetrating his fraud against John Hancock.

4. As with Mr. Mehta, John Hancock issued a Long-Term Care Insurance Policy to Mrs. Mehta ("Priti Mehta's Policy" and, with the LTC Policy, the "Policies"). Each of the Policies contains a SharedCare Benefit rider (the "SharedCare Rider"). The SharedCare Rider provides that, once Mr. Mehta or Mrs. Mehta reaches their respective policy limit and exhausts all the benefits in their respective Policies, Mr. Mehta and Mrs. Mehta are then entitled to access the available benefits in each other's Policies.

5. Mr. Mehta exhausted the benefits available in his LTC Policy in December 2023. Thereafter, pursuant to the SharedCare Rider, Defendants withdrew at least $100,000 from Priti Mehta's Policy and used these funds as part of Mr. Mehta's scheme to improperly obtain long-term care insurance reimbursement payments from John Hancock.

6. Because it would be manifestly unjust to force John Hancock to continue to insure Mr. Mehta and Mrs. Mehta for long-term care benefits given their intentional and systematic pattern of fraud, John Hancock also seeks to end its contractual relationship with Mr. Mehta and Mrs. Mehta.

7. Each act of insurance fraud adversely affects not just John Hancock, but the insurance costs and coverage options for every American seeking long-term care insurance coverage. One key reason the cost of long-term care insurance has increased substantially over the past few decades is because of unscrupulous attempts by certain insureds to manipulate and misuse

the benefits paid by insurance companies, thus decreasing the amount of actual coverage available to other innocent insureds while contemporaneously increasing the cost and risks to insurers to provide such coverage. This anti-consumer behavior should not be rewarded—or borne by other policyholders—and Defendants must return the fraudulently obtained monies to John Hancock.

## PARTIES

8.   John Hancock Life & Health Insurance Company is an insurance company organized and existing under the laws of the State of Delaware, with its principal place of business located in Boston, Massachusetts. At all relevant times, John Hancock has been in the business of underwriting policies of long-term care insurance and is authorized to transact business in the State of New York.

9.   Saurin P. Mehta is a natural person, an insured person under his LTC Policy, and a resident of White Plains, Westchester County, State of New York.

10.   Priti S. Mehta is a natural person, an insured person under Priti Mehta's Policy, and a resident of White Plains, Westchester County, State of New York.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332(a) because there is diversity of citizenship between Plaintiff and Defendants, and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

12.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because this is the judicial district in which Defendants reside, and it is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims against Defendants occurred.

BACKGROUND

13. On October 6, 2010, John Hancock issued the LTC Policy to Mr. Mehta. The LTC Policy set forth certain circumstances under which Mr. Mehta may be eligible to obtain reimbursement for monies spent by Mr. Mehta in hiring caregivers to assist with his care.

14. The LTC Policy provides, in relevant part, that Mr. Mehta must establish a need for "Substantial Assistance" in performing at least two "Activities of Daily Living" in order for him to be eligible for reimbursement payments.

15. The LTC Policy defines "Substantial Assistance" as follows: "You need hands-on or standby assistance while You are performing an Activity of Daily Living."

16. The LTC Policy defines "Activities of Daily Living" as the following activities:

   a) "*Bathing* which means washing Yourself by sponge bath; or in either a tub or shower, including the task of getting into or out of the tub or shower.

   b) *Continence* which means the ability to maintain control of bowel and bladder functions; or when unable to maintain control of bowel or bladder functions, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

   c) *Dressing* which means putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

   d) *Eating* which means feeding Yourself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously. Eating does not include preparing a meal.

   e) *Toileting* which means getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

   f) *Transferring* which means moving into or out of a bed, chair or wheelchair. Transferring does not include the task of getting into or out of the tub or shower."

17. The LTC Policy is a "reimbursement policy," whereby the insured is responsible for paying covered expenses out-of-pocket, which include the costs associated with paying an

4

Independent Care Provider ("ICP") to care for the insured. The policy-insured then submits a claim to the insurer, along with a corresponding invoice (including ICP timesheets) evidencing the covered expenses, and the insurer reimburses the insured consistent with the terms and limits of the policy.

18. In July 2021, Mr. Mehta filed his initial claim against the LTC Policy based upon several progressive diagnoses. According to his claim, Mr. Mehta required hands-on assistance and/or supervision with most Activities of Daily Living.

19. Mr. Mehta claimed that the hands-on assistance and/or supervision he purportedly required for his Activities of Daily Living were provided at different times by four ICPs that Mr. Mehta had hired and paid directly for their services. The four ICPs were Lyliana Udeagha ("Ms. Udeagha"), Mary Yartey ("Ms. Yartey"), Lanisha Simmons ("Ms. Simmons"), and Jalna Bien-Aime ("Ms. Bien-Aime").

20. Between July 2021 and at least March 2025, Mr. Mehta routinely submitted invoices seeking reimbursement for payments Mr. Mehta allegedly made to Ms. Udeagha, Ms. Yartey, Ms. Simmons, and Ms. Bien-Aime for allegedly assisting Mr. Mehta with his Activities of Daily Living. John Hancock reimbursed Mr. Mehta based on the invoices and supporting documents he submitted.

21. In January 2025, John Hancock's Long-Term Care Fraud, Waste & Abuse Team flagged Mr. Mehta's account after detecting several client portal logins from outside the State of New York, where Mr. Mehta resides, thereby raising suspicions that Mr. Mehta may have been traveling while invoicing John Hanock for long-term care ICP services even though Mr. Mehta may not have been receiving ICP care during those times.

22. As a result of the suspicious client portal logins, John Hancock began investigating Mr. Mehta for potential fraudulent activity.

23. In March 2025, John Hancock learned that Mr. Mehta had been involved in a motor vehicle accident on August 13, 2024. The records from that motor vehicle accident indicated that Mr. Mehta was the driver of his vehicle at the time of the accident.

24. The records from the motor vehicle accident on August 13, 2024, further indicated that during multiple medical assessments related to the accident, Mr. Mehta claimed to attendant medical professionals that he was mostly independent in performing his Activities of Daily Living before the accident occurred. Specifically, Mr. Mehta indicated that he was capable of dressing himself, walking, performing self-care, and climbing stairs, and did not experience difficulties with concentration or decision-making.

25. On April 15, 2025, a representative from John Hancock's Global Investigative & Forensic Services conducted a telephone interview with Mr. Mehta.

26. During the April 15, 2025 interview, Mr. Mehta stated that he requires ICP services seven (7) days a week, and his level of dependence increased following the motor vehicle accident of August 13, 2024. Mr. Mehta denied ever claiming to be independent with his Activities of Daily Living to any medical service providers he interacted with following the accident.

27. During the same interview, Mr. Mehta admitted traveling to California in August and December of 2024 to visit his son, accompanied by one of his ICPs, though he could not recall which ICP allegedly accompanied him to California. Mr. Mehta stated that these were his only trips outside of New York State while receiving benefits under the LTC Policy.

28. Mr. Mehta also confirmed in the interview that he, personally, handled claim invoicing to John Hancock and used either his mobile phone or iPad for reimbursement submissions through John Hancock's online portal.

29. Following the April 15, 2025 interview, John Hancock detected client portal logs from Texas and Illinois on the day of the interview, suggesting that Mr. Mehta may have been traveling outside of New York during the interview but concealed this information from the interviewer.

30. Thereafter, on April 16, 2025, a representative of John Hancock spoke with Ms. Udeagha, who was one of the ICPs Mr. Mehta claimed he had hired to assist with his Activities of Daily Living. Ms. Udeagha initially stated that she did not know anyone by the name of Saurin Mehta. When shown a photograph of Mr. Mehta, Ms. Udeagha stated that she recognized him as a person who interviewed her for a caregiver job in Spring 2022. However, Ms. Udeagha advised that she had declined Mr. Mehta's job offer and never worked for him.

31. Ms. Udeagha further advised that she did not receive payment for meeting with Mr. Mehta, as she did not ultimately accept his offer of employment. Ms. Udeagha confirmed that this was the only occasion she had met Mr. Mehta.

32. Ms. Udeagha further advised that, at the time she met Mr. Mehta in Spring 2022, she provided him with copies of her driver's license and professional certification, and that, at Mr. Mehta's request, she had signed a document that he had informed her was an insurance provider form.

33. On April 17, 2025, Ms. Udeagha provided John Hancock with a copy of an email communication between her and Mr. Mehta noting that on April 20, 2022, Ms. Udeagha declined Mr. Mehta's job offer in writing.

34. Even though Ms. Udeagha expressly declined Mr. Mehta's job offer and never worked for him, Mr. Mehta falsely reported Ms. Udeagha to John Hancock as an ICP that he had allegedly employed to assist with his Activities of Daily Living. Mr. Mehta routinely submitted invoices, including copies of checks that Mr. Mehta had allegedly paid to Ms. Udeagha, to John Hancock for reimbursement pursuant to the LTC Policy. In turn, relying on the representations and information provided by Mr. Mehta, John Hancock reimbursed Mr. Mehta consistent with the limits of the LTC Policy.

35. Mr. Mehta obtained at least $51,568 in reimbursements from John Hancock for alleged ICP services that, in fact, were not provided by Ms. Udeagha to Mr. Mehta.

36. On April 17, 2025, a representative of John Hancock spoke with Ms. Yartey. During the interview, Ms. Yartey confirmed that she worked for Mr. Mehta for less than one year, from Spring 2022 to early Spring 2023. Ms. Yartey informed John Hancock that she had provided homemaking services for Mr. Mehta and Mrs. Mehta, which primarily included meal preparation and cleaning. Homemaking services are not covered under the LTC Policy.

37. Contrary to Mr. Mehta's representations to John Hancock, Ms. Yartey stated that Mr. Mehta was independent with his Activities of Daily Living during the period in which she worked for him.

38. During the interview, Ms. Yartey stated that Mr. Mehta always paid her in cash, "off the books," per their agreement at the time of her hiring. Ms. Yartey also recalled signing blank timesheets for Mr. Mehta at his request.

39. Ms. Yartey stated that she never traveled with Mr. Mehta out of the State of New York and that she ended her employment with Mr. Mehta around the time he moved from Scarsdale, New York, to White Plains, New York in or about April 2023.

40. During the interview, Ms. Yartey confirmed that she had only provided homemaking services to Mr. Mehta, which are not covered by Mr. Mehta's LTC Policy.

41. Furthermore, John Hancock was billed for services not rendered by Ms. Yartey. Indeed, even after Ms. Yartey ceased working for Mr. Mehta, Mr. Mehta routinely submitted invoices, including copies of checks that Mr. Mehta had allegedly paid to Ms. Yartey, to John Hancock for reimbursement under the LTC Policy. In turn, relying on the representations and information provided by Mr. Mehta, John Hancock reimbursed Mr. Mehta consistent with the limits of the LTC Policy.

42. Mr. Mehta obtained at least $106,177 in reimbursements from John Hancock for non-covered homemaking services billed in Ms. Yartey's name, as well as for services that Ms. Yartey never provided to Mr. Mehta at all because she had stopped working for him by then.

43. On April 17, 2025, a representative of John Hancock spoke with Ms. Simmons. During the interview, Ms. Simmons confirmed that she worked for Mr. Mehta for only several months in and around Spring 2022.

44. Ms. Simmons stated that her responsibilities for Mr. Mehta included house cleaning, mopping floors, and extensive cooking. These homemaking services are not covered under the LTC Policy. Ms. Simmons indicated that she did not provide any assistance to Mr. Mehta with Activities of Daily Living.

45. Ms. Simmons further advised that Mr. Mehta asked her to sign blank timesheets because, as he explained to her, it would be more convenient to sign multiple blank invoices at once. Ms. Simmons stated that she served as a housekeeper while working for Mr. Mehta.

46. Subsequent to the conversation of April 17, 2025, Ms. Simmons provided John Hancock with a photograph of a written agreement signed by her and Mr. Mehta setting forth the

scope of Ms. Simmons' services for Mr. Mehta. That agreement mentions only homemaker services to be provided by Ms. Simmons. The agreement makes no mention of purported assistance by Ms. Simmons with Mr. Mehta's Activities of Daily Living.

47. Nevertheless, even though Ms. Simmons did not provide Mr. Mehta with covered services, Mr. Mehta routinely submitted invoices, including copies of checks that Mr. Mehta had allegedly paid to Ms. Simmons, to John Hancock for reimbursement pursuant to the LTC Policy. In turn, relying on the representations and information provided by Mr. Mehta, John Hancock reimbursed Mr. Mehta consistent with the limits of the LTC Policy.

48. Mr. Mehta obtained at least $952 in reimbursements from John Hancock for non-covered services billed in Ms. Simmons' name.

49. On April 30, 2025, a representative of John Hancock spoke with Ms. Bien-Aime. Ms. Bien-Aime advised that she worked for Mr. Mehta for approximately three (3) months from late 2021 to early 2022.

50. Ms. Bien-Aime stated that her primary responsibilities for Mr. Mehta included doing laundry, meal preparation, cleaning the entire house, and occasionally driving Mr. Mehta and Mrs. Mehta to visit their daughter in Manhattan, New York.

51. Ms. Bien-Aime confirmed that she stopped working for Mr. Mehta in or about January of 2022 due to Mr. Mehta's failure to pay her for her services.

52. Nevertheless, even though Ms. Bien-Aime did not provide Mr. Mehta with covered services and Mr. Mehta failed to pay Ms. Bien-Aime for at least some of the (non-covered) services she actually provided, Mr. Mehta routinely submitted invoices, including copies of checks that Mr. Mehta had allegedly paid to Ms. Bien-Aime, to John Hancock for reimbursement pursuant to the

LTC Policy. In turn, relying on the representations and information provided by Mr. Mehta, John Hancock reimbursed Mr. Mehta consistent with the limits of the LTC Policy.

53. Mr. Mehta obtained at least $21,368 in reimbursements from John Hancock for non-covered services billed in Ms. Bien-Aime's name.

54. Based on the information known to date, Mr. Mehta did not receive eligible services from any of the four ICPs he identified to John Hancock: that is, Ms. Udeagha, Ms. Yartey, Ms. Simmons, and Ms. Bien-Aime.

55. Through at least March 30, 2025, John Hancock reimbursed Mr. Mehta at least $180,065 in claimed benefits under his LTC Policy based on fraudulent and misleading invoices, claim forms, and copies of checks submitted by Mr. Mehta.

56. To perpetrate his fraud, Mr. Mehta repeatedly used the personal information and professional credentials of the ICPs (Ms. Udeagha, Ms. Yartey, Ms. Simmons, and Ms. Bien-Aime) without their knowledge or authorization.

57. In connection with each invoice submitted to John Hancock seeking reimbursement under the LTC Policy, Mr. Mehta electronically signed a fraud attestation to John Hancock, which provided that: "I attest to the knowledge that an individual who submits an invoice with an intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deceptive statement is guilty of insurance fraud and may be subject to criminal and civil penalties."

58. Additionally, Mr. Mehta provided John Hancock with false and misleading proof of payment documents, as the checks he submitted to John Hancock were not in fact issued to or cashed by the ICPs.

59. The LTC Policy is unambiguous regarding the requirements for eligible care and receiving reimbursement for expenses. The LTC Policy is also unambiguous in stating that if John Hancock makes payments in excess of the benefits payable under the policy, it will have the right to recover such excess payments from the policyholder.

60. In reliance on the truthfulness and accuracy of the invoices submitted by Mr. Mehta, between July 2021 and at least March 2025, John Hancock reimbursed Mr. Mehta for covered services allegedly provided by the ICPs and paid out of pocket by Mr. Mehta.

61. Mr. Mehta has repeatedly committed insurance fraud and knowingly billed John Hancock under the LTC Policy for fabricated services Mr. Mehta knew did not occur or did not qualify for reimbursement.

62. Mrs. Mehta has aided and abetted Mr. Mehta's fraud by allowing Mr. Mehta to use the Priti Mehta's Policy balance as his piggy bank.

63. John Hancock issued Priti Mehta's Policy on or about November 4, 2010.

64. The LTC Policy (issued to Mr. Mehta) and Priti Mehta's Policy each contained the SharedCare Rider. Upon exhausting the benefits in their respective Policies, the SharedCare Rider enabled Mr. Mehta and Mrs. Mehta to access the available benefits in each other's Policies.

65. Mr. Mehta reached his policy limit and exhausted the benefits available in his LTC Policy on or about December 21, 2023. Thereafter, pursuant to the SharedCare Rider, Mr. Mehta and Mrs. Mehta transferred $25,000 from Priti Mehta's Policy to Mr. Mehta's LTC Policy on four separate occasions, namely: on January 2, 2024; March 13, 2024; November 7, 2024; and March 25, 2025. Thus, Mr. Mehta and Mrs. Mehta withdrew a total of at least $100,000 from Priti Mehta's Policy and transferred these funds to Mr. Mehta's LTC Policy.

66. Mr. Mehta and Mrs. Mehta used the $100,000 withdrawn from Priti Mehta's Policy to reimburse Mr. Mehta for receiving non-covered ICP services and, in the case of Ms. Udeagha, for alleged ICP services that never actually occurred (as Ms. Udeagha in fact never worked for Mr. Mehta).

67. In multiple letters between May 2025 and December 2025, John Hancock demanded repayment of the benefits that Mr. Mehta improperly obtained from John Hancock through false and fraudulent pretenses. John Hancock also provided Mr. Mehta and his counsel with details establishing that Mr. Mehta had undertaken a scheme to defraud John Hancock of benefits under the LTC Policy; however, to date, Mr. Mehta has refused to return his ill-gotten proceeds to John Hancock, thereby forcing John Hancock to retain counsel and file this lawsuit.

AS AND FOR A FIRST CAUSE OF ACTION
(Long-Term Care Insurance Fraud – Against Saurin P. Mehta)

68. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

69. Mr. Mehta first purchased the LTC Policy in 2010 but claimed to begin receiving care from ICPs in or about July 2021.

70. John Hancock issued the LTC Policy to Mr. Mehta.

71. Mr. Mehta personally made representations and submitted invoices on his own behalf seeking reimbursement payments under the LTC Policy.

72. The invoices and claim forms submitted by Mr. Mehta were false and misleading, as Mr. Mehta knew that the ICPs provided Mr. Mehta with non-covered services under the LTC Policy, such as cooking and cleaning services.

73. The invoices and claim forms submitted by Mr. Mehta were also false and misleading because Mr. Mehta knew that some of the ICPs that he identified to John Hancock

were never employed by Mr. Mehta.

74. When making claims against his LTC Policy, Mr. Mehta misrepresented his intention to use the benefits under the LTC Policy to compensate ICPs and submitted false invoices to John Hancock in order to keep the reimbursements for himself.

75. Mr. Mehta knew that his representations to John Hancock were false and that the fraudulent invoices were in direct violation of the LTC Policy.

76. Notwithstanding, Mr. Mehta made the misstatements to John Hancock to induce its reliance in the form of John Hancock's issuance of reimbursement payments in order to plunder a total of at least $180,065 from the LTC Policy.

77. John Hancock's reliance upon the invoices and claim forms submitted by Mr. Mehta was justifiable because, until the misrepresentations were identified, the invoices appeared to be legitimately issued by Mr. Mehta.

78. John Hancock overpaid Mr. Mehta, based upon his knowing and deliberate misrepresentations, in an amount not less than $180,065 exclusive of costs and interest.

79. Notwithstanding John Hancock's repeated demands, Mr. Mehta has refused to return the fraudulently obtained $180,065.

AS AND FOR A SECOND CAUSE OF ACTION
(Breach of Contract – Against Saurin P. Mehta)

80. John Hancock repeats and re-alleges each and every allegation set forth above as if more fully set forth herein.

81. The LTC Policy is an insurance contract offered, negotiated, and accepted as between Mr. Mehta and John Hancock.

82. John Hancock fully performed its obligations under the LTC Policy to Mr. Mehta by paying for what it understood to be covered services as defined by the LTC Policy.

83. However, Mr. Mehta repeatedly breached the terms of the LTC Policy beginning in July 2021 by accepting the benefits of reimbursements based upon false and/or misleading invoices submitted by him to John Hancock.

84. John Hancock has been damaged by Mr. Mehta's breaches in an amount not less than $180,065, exclusive of costs and interest.

AS AND FOR A THIRD CAUSE OF ACTION
(Money Had and Received – Against Saurin P. Mehta)

85. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

86. Mr. Mehta received funds belonging to John Hancock by making materially false statements in the invoices and claim forms that were submitted to John Hancock in order to induce payment by John Hancock on claims against the LTC Policy.

87. Mr. Mehta benefitted from receipt of those monies, which, had he submitted correct and accurate invoices, he would not otherwise have received, in an amount not less than $180,065, exclusive of costs and interest.

88. Under principles of equity and good conscience, Mr. Mehta should not be permitted to retain those monies, which are the fruits of his intentional, knowing misrepresentations to John Hancock.

AS AND FOR A FOURTH CAUSE OF ACTION
(Unjust Enrichment – Against Saurin P. Mehta)

89. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

90. By submitting false information to John Hancock to secure payment for claims against the LTC Policy that should not have been paid, Mr. Mehta was enriched in an amount not

less than $180,065, exclusive of costs and interest.

91. Mr. Mehta was enriched at the expense of John Hancock, which reimbursed him for his false and misleading claims.

92. John Hancock has been damaged by Mr. Mehta's unjust receipt of the payments for improperly submitted claims.

93. Under principles of equity and good conscience, Mr. Mehta should not be permitted to retain those monies, which are the fruits of his intentional, knowing misrepresentations to John Hancock.

AS AND FOR A FIFTH CAUSE OF ACTION
(Conversion – Against Saurin P. Mehta)

94. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

95. Beginning in or about July 2021, Mr. Mehta, intentionally and without authority under the LTC Policy, assumed and exercised control over property—money—belonging to John Hancock in an amount not less than $180,065, exclusive of costs and interest.

96. Mr. Mehta exercised that control by submitting false and misleading invoices to obtain the money from John Hancock for non-covered services for which he was not entitled to be paid, and for services that were never performed at all by ICPs that were not actually employed by Mr. Mehta.

97. Mr. Mehta's conduct interfered with John Hancock's superior right in possession of those funds pending a proper claim.

98. Mr. Mehta's interference was in exclusion of John Hancock's rights to the money.

99. John Hancock has made demand for return of the converted funds.

100. Mr. Mehta has refused to return the converted funds.

101. John Hancock's demand for the funds is not futile.

## AS AND FOR A SIXTH CAUSE OF ACTION
(Aiding and Abetting Insurance Fraud – Against Priti S. Mehta)

102. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

103. The LTC Policy (issued to Mr. Mehta) and Priti Mehta's Policy contained the SharedCare Rider, pursuant to which Mr. Mehta and Mrs. Mehta, upon exhausting the benefits under their respective Policies, could then access the available benefits in each other's Policies.

104. Mr. Mehta exhausted the benefits available under his LTC Policy on or about December 21, 2023. Thereafter, with Mrs. Mehta's knowledge, consent, and cooperation, Mr. Mehta and Mrs. Mehta transferred a total of at least $100,000 from Priti Mehta's Policy to Mr. Mehta's LTC Policy.

105. Mrs. Mehta, Mr. Mehta's spouse, had actual knowledge that, upon transferring the funds from Priti Mehta's Policy to Mr. Mehta's LTC Policy, Mr. Mehta used the transferred funds in order to obtain reimbursement for non-covered ICP services provided to Mr. Mehta and, in the case of Ms. Udeagha, for alleged ICP services that never actually occurred.

106. Mrs. Mehta had actual knowledge that Mr. Mehta was making material misrepresentations to fraudulently obtain payments from John Hancock.

## AS AND FOR A SEVENTH CAUSE OF ACTION
(Declaratory Judgment – No Coverage as to Saurin P. Mehta)

107. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

108. An actual and present legal controversy exists as between John Hancock and Mr. Mehta.

109. John Hancock contends that Mr. Mehta materially breached the terms of his LTC Policy, committed long-term care insurance fraud, and that he was not and is not entitled to coverage under his LTC Policy, including all riders associated with and incorporated into the LTC Policy.

110. Mr. Mehta claims he was, and is, entitled to coverage under his LTC Policy.

111. John Hancock has no adequate remedy at law.

112. John Hancock desires a judicial declaration of its rights and obligations under Mr. Mehta's LTC Policy.

AS AND FOR AN EIGHTH CAUSE OF ACTION<br>(Declaratory Judgment – No Coverage as to Priti S. Mehta)

113. John Hancock repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

114. An actual and present legal controversy exists as between John Hancock and Mrs. Mehta.

115. John Hancock contends that Mrs. Mehta aided and abetted Mr. Mehta in committing long-term care insurance fraud, and that Mrs. Mehta is not entitled to coverage under Priti Mehta's Policy, including all riders associated with and incorporated into Priti Mehta's Policy.

116. Mrs. Mehta claims she was, and is, entitled to coverage under Priti Mehta's Policy.

117. John Hancock has no adequate remedy at law.

118. John Hancock desires a judicial declaration of its rights and obligations under Priti Mehta's Policy.

**WHEREFORE**, Plaintiff demands judgment from Defendants as follows:

(a) On the First Cause of Action, in favor of Plaintiff John Hancock and against Defendant Saurin P. Mehta in an amount to be determined at trial, but in no event less than $180,065;

(b) On the Second Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Saurin P. Mehta, in an amount to be determined at trial, but in no event less than $180,065;

(c) On the Third Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Saurin P. Mehta, in an amount to be determined at trial, but in no event less than $180,065;

(d) On the Fourth Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Saurin P. Mehta, in an amount to be determined at trial, but in no event less than $180,065;

(e) On the Fifth Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Saurin P. Mehta, in an amount to be determined at trial, but in no event less than $180,065;

(f) On the Sixth Cause of Action, in favor of Plaintiff John Hancock, and against Defendant Priti S. Mehta, in an amount to be determined at trial, but in no event less than $100,000;

(g) On the Seventh Cause of Action, for declaratory relief in favor of Plaintiff John Hancock against Defendant Saurin P. Mehta;

(h) On the Eighth Cause of Action, for declaratory relief in favor of Plaintiff John Hancock against Defendant Priti S. Mehta;

(i) For Plaintiff John Hancock's costs and disbursements in this action, including its reasonable attorneys' fees;

(j) Pre-judgment and post-judgment interest; and

(k) For such other and further relief as the Court deems just, equitable and proper.

**JURY DEMAND**

      Plaintiff John Hancock Life & Health Insurance Company hereby demands trial by jury as to all issues herein presented.

                                         SICHENZIA ROSS FERENCE CARMEL LLP

                                         By:   */s/ Amit Shertzer*
                                         A.R. John Hitchings, Esq.
                                         Amit Shertzer, Esq.
                                         1185 Avenue of the Americas, 31st Floor
                                         New York, New York 10036
                                         Telephone: (212) 930-9700
                                         E-mail: jhitchings@srfc.law
                                                           ashertzer@srfc.law

                                         *Attorneys for Plaintiff*
                                         *John Hancock Life & Health Insurance Company*

Dated: February 5, 2026